## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| PATRIOT CONSTRUCTION & EQUIPMENT, LLC | : | DOCKET NO. 2:13-CV-01529 |
| VS. | : | JUDGE MINALDI |
| QUAD STATES CONSTRUCTION, LLC | : | MAGISTRATE JUDGE KAY |

### REPORT AND RECOMMENDATION

#### INTRODUCTION

Before the court is the motion to compel mediation and arbitration and to stay court proceedings [doc. 8] filed by Quad States Construction, LLC ("Quad States"). Quad States seeks an order: (1) compelling plaintiff Patriot Construction and Equipment, LLC ("Patriot") to mediate its claims that are the subject of its litigation; (2) compelling Patriot to arbitrate those claims should mediation fail; and (3) staying this action pending the outcome of mediations or arbitration. Doc. 8, p. 1. Quad States bases its motion on a clause in the subcontract between it and Patriot. *Id.* Patriot responds that their suit concerns work that was not included in the subcontract and therefore the clause is inapplicable. Doc. 10, p. 1.

This matter has been referred to the undersigned by the district court for review, report, and recommendation in accordance with 28 U.S.C. § 636(b)(1). Doc. 22. Having reviewed the matter, it is RECOMMENDED that the motion should be GRANTED.

# I. FACTS & PROCEDURAL HISTORY

This case concerns an AIA standard contractor-subcontractor agreement ("the subcontract") in connection with the Willowood development project in Welsh, Louisiana ("the Willowood development").  Doc. 8, att. 2, p. 1.

## A. Patriot's Work on the Willowood Development

Quad States, the general contractor on the Willowood development, entered into a subcontract.  Doc. 8, att. 2.  Patriot was to furnish labor and materials for numerous tasks, including sewer collection. *Id.* p. 10.

The initial proposal for sewer collection work required Patriot to furnish and install "several feet of standard dimension ratio (SDR) pipe, tracer wire, and detectable tape, wye pipe connectors, pipe dimension reducers, and other pipe related products."  Doc. 10, p. 3 at ¶ 11; *see also* doc. 10, att. 1, p. 2.  Neither the initial proposal nor the subcontract mentioned the Willowood development's preexisting sewer lift station.[1]

Several months after Patriot's initial work was completed, Welsh city officials determined that the lift station needed to be upgraded.  Doc. 10, p. 3 at ¶ 16.  Patriot submitted a proposal for the upgrade.  Doc. 10, att. 1, p. 22.  Quad States accepted the proposal and Patriot performed the work.  Doc. 10, p. 4 at ¶ 20.

On October 15, 2011, Patriot submitted its eighth and final pay application to Quad States.  Doc. 10, att. 1, pp. 35–36.  The lift station was initially listed as a change order for a cost

---

[1] Patriot defines a sewer lift station as follows:

> Generally speaking, a sewer lift station is a facility including one or more pumps and equipment for pumping sewerage from one place to another. In such a system, [a] sewage can be fed into and stored in an underground pit called a wet well. When the sewage level in the wet well rises to a predetermined point, a pump will lift the sewage upward through a pressurized pipe system from where the sewage is discharged into a gravity manhole. The cycle repeats itself until the sewage reaches its destination, i.e., a sewage treatment plant.

Doc. 10, p. 3 at ¶ 15.

of $77,302.16.  *Id.* at 36.  However Quad States requested that Patriot invoice the lift station work separately.  Doc. 11, pp. 2–3; *see also* doc. 11, att. 1, p. 2 at ¶ 5.  Quad States requested the separate invoice "[b]ecause the construction financing for the Willowood development did not contain monies for the sewer lift station work . . . ." Doc. 11, att. 1, p. 2 at ¶ 5.  Per the request, Patriot submitted a revised pay application no. 8 without the lift station work [doc. 10, att. 1, pp. 26–27] and issued a separate invoice for same [doc. 10, att. 1, p. 23].

**B. State Court Suit & Removal**

Patriot's eight pay applications total $894,346.16.  Doc. 1, att. 1, p. 31.  Including the separate invoice for the lift station, the total amount billed to Quad States was $971,648.16.  *Id.* Quad States paid a substantial portion of that sum.  *Id.*

On May 9, 2013, Patriot filed a "petition in suit open account" in the 31st Judicial District Court in and for Jefferson Davis Parish, Louisiana.  Doc. 1, att. 1, pp. 2–3.  Patriot sought recovery of $98,399.98, the amount of principal and interest Quad States allegedly owed through July 10, 2012.  *Id* at ¶ 4.  Patriot additionally sought interest accruing after that date. *Id.*

On June 7, 2013 Quad States removed the case to this court based on diversity of citizenship. Doc. 1, p. 3.

**C. Current Posture**

Quad States now seeks an order to stay the proceedings pending the outcome of mediation and arbitration. Quad States relies on Article 6 of the subcontract, providing for "mediation and binding dispute resolution."  Article 6 states in pertinent part:

**ARTICLE 6 MEDIATION AND BINDING DISPUTE RESOLUTION**

**§ 6.1 MEDIATION**

**§ 6.1.1** Any claim arising out of or related to this Subcontract, except those waived in this Subcontract, shall be subject to mediation as a condition precedent to binding dispute resolution.

**§ 6.1.2** The parties shall endeavor to resolve their claims by mediation . . . . [A request for mediation] may be made concurrently with the filing of binding dispute resolution proceedings but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation . . . .

**§ 6.1.3** The parties shall share the mediator's fee and any filing fees equally.  The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon.   Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

**§ 6.2 BINDING DISPUTE RESOLUTION**

For any claim subject to, but not resolved by mediation pursuant to Section 6.1, the method of binding dispute resolution shall be . . . [a]rbitration pursuant to Section 6.3 of this Agreement.

**§ 6.3 ARBITRATION**

**§ 6.3.1** If the Contractor and Subcontractor have selected arbitration as the method of binding dispute resolution in Section 6.2, any claim subject to, but not resolved by, mediation shall be subject to arbitration . . . .

Doc. 8, att. 2, p. 8.

Quad States argues that article 6 clearly contemplates the instant dispute.  Doc. 8, att. 1, pp. 13–14.  Patriot argues that article 6 does not apply to its lift-station claims because that work was invoiced separately and never formally made part of the subcontract.  Doc. 10, pp. 6–8.

Patriot concedes that its claims other than for the lift station are arbitrable  *Id.* at 8  As such Patriot asks the court to sever the claims for arbitration purposes.  *Id.* at 8.  However, Patriot further argues that, because its non-lift-station claims are for a nominal amount, mediation and

arbitration would be "so onerous as to be unconscionable." *Id.* at 8–9. Patriot therefore suggests that a settlement conference conducted by this court would be more appropriate. *Id.*

## II. LEGAL STANDARDS

### A. Arbitration Generally

"The Federal Arbitration Act ("FAA") provides that pre-dispute arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Carter v. Countrywide Credit Industries, Inc.,* 362 F.3d 294, 297 (5th Cir.2004) (quoting 9 U.S.C. § 2). The FAA evinces a strong presumption in favor of arbitration and the party seeking to invalidate an agreement to arbitrate bears the burden of persuasion. *Id.* (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). Any doubts regarding the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).

When considering motions to compel arbitration, courts conduct a limited two-step inquiry. The first step is to determine whether the parties agreed to arbitrate the dispute in question. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996). The first step itself involves two considerations: (a) whether there is a valid agreement to arbitrate between the parties and (b) whether the dispute in question falls within the scope of that agreement. *Id.* The second step is to determine whether any federal statute or policy renders the claims nonarbitrable. *Will–Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211, 214 (5th Cir. 2003).

Courts generally apply ordinary state-law principals governing contract formation in determining whether the parties agreed to arbitrate. *Webb*, 89 F.3d at 258. "State law must be applied, however, with due regard to the federal policy favoring arbitration . . . ." *Harding v.*

*Midsouth Bank N A*, 2012 WL 4753414 at *2 (W.D. La. 2012) (citing *Webb*, 89 F.3d at 258).

**B. Scope of an Arbitration Clause**

Courts in the Fifth Circuit determine whether a dispute falls within the scope of an arbitration clause depending on whether the clause is "broad" or "narrow." *Pennzoil Exploration and Prod. Co. v. Ramco Energy, Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

A broad arbitration clause demonstrates the intent of the parties to arbitrate an "expansive reach" of disputes. *Id.* Arbitration clauses that cover "any controversy or claim arising out of or relating to the agreement" are characterized as broad. *Prima Paint Corp v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 397–98 (1967). Other clauses considered broad contain language such as: "any dispute or difference between the parties;" "any dispute with respect to the interpretation or performance of the contract;" or "any controversy or claim relating to the Agreement." *Quick Print of New Orleans v. Danka Office Imaging Co.*, 2004 WL 1488656 at *2 (E.D. La. 2004) (citing *Pennzoil Exploration*, 139 F.3d at 1067). When an arbitration clause is broad, any dispute "having a significant relationship to the contract" will be considered arbitrable. *Pennzoil Exploration*, 139 F.3d at 1068.

Conversely, narrow arbitration clauses allow for arbitration of only particular types of disputes. *Id.* at 1067. A narrow arbitration clause typically uses language limiting arbitration to disputes "arising out of" or "under" the contract. *Harding*, 2012 WL 4753414 at *4. When an arbitration clause is narrow, the court must determine whether the dispute at issue is contemplated by the narrow language of the clause. *Crochet Equip. Co., Inc. v. Bd. Of Cty. Comm'rs*, 20 F. Supp. 2d 987, 989 (M.D. La. 1998).

Ambiguities as to the scope of an arbitration provision are resolved in favor of an order of arbitration. *Harding*, 2012 WL 4753414 at *2. Indeed, "[a] presumption of arbitrability exists

requiring that whenever the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration." *Mar-Len of Louisiana, Inc. v. Parsons-Gilbane*, 773 F.2d 633, 635 (5th Cir. 1985).

### III. DISCUSSION

The parties do not dispute that the subcontract contains a valid arbitration clause and neither do either claim that Patriot's claims are otherwise nonarbitrable.  What is disputed is whether Patriot's lift-station claim falls within the scope of the arbitration clause.

Article 6 provides for mediation and arbitration of "*[a]ny claim arising out of or related to this Subcontract*"  Doc. 8, att. 2, p. 8 (emphasis added).  Under the applicable law, this is a broad-form arbitration clause.  *See, e.g.*, *Prima Plant Corp.*, 388 U.S. at 397–98 (characterizing a nearly identical clause as broad);  *Nauru Phosphate Royalties, Inc. v. Drago Daic Indus. Interests, Inc.*, 138 F.3d 160, 164–65 (holding that a clause requiring arbitration of "[a]ny dispute, controversy or claim arising out of or in connection with or relating to this Agreement" covered "all aspects of the relationship" between the parties).  When, as here, an arbitration provision covers all claims "related to" the agreement, arbitration is "not limited to claims that literally 'arise under the contract,' but rather embrace[s] all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Pennzoil Exploration*, 139 F.3d at 1067.

The lift-station claim bears a significant relationship to the subcontract such that article 6 is applicable.  "[S]eparate agreements executed contemporaneously by the parties, for the same purposes, and as part of the same overall transaction, are to be construed together."  *Neal v. Hardee's Food Systems*, 918 F.2d 34, 37 (5th Cir. 1990) (citations omitted).   When the agreement that is essential to the overall transaction contains a broad arbitration clause, the

clause reaches all aspects of the transaction, "including those aspects governed by other contemporaneously executed agreements that are part of the same transaction." *Pers. Sec. Safety Sys., Inc. v. Motorala, Inc.*, 297 F.3d 388, 394–95 (5th Cir. 2002).

Here, the subcontract was the entire basis of the parties' relationship. Patriot's lift station work was first billed under the subcontract, and then a separate invoice was contemporaneously executed per Quad States' request. Even though the lift-station work was not formally billed under the subcontract, it was part of the same overall transaction between Quad States and Patriot on the Willowood development.

Accordingly, the lift-station work was within the scope of Article 6, and Patriot's lift station claims should be referred to mediation and arbitration as required by the subcontract. This conclusion moots Patriot's argument that its other claims should be severed. Furthermore, legal proceedings must be stayed pending the outcome of alternative dispute resolution. *Folse v. Richard Wolf Medical Instruments Corp.*, 56 F.3d 603, 605–06 (5th Cir. 1995) (citing 9 U.S.C. § 3).

CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that Quad States' motion to compel mediation and arbitration and to stay court proceedings [doc. 8] should be GRANTED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Civ. Proc. 72(b), a party aggrieved by this order has 14 days from service of this recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within 14 days after being served with a copy thereof.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation 14 days following**

**the date of its service, or within the time frame authorized by shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.**

THUS DONE this 21st day of November, 2013.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE